[Cite as *State ex rel. Peregrine Health Servs. of Columbus, L.L.C. v. Sears, Dir., Ohio Dept. of Medicaid*, 2020-Ohio-3426.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Peregrine Health Services
of Columbus, LLC dba Summit's Trace
Healthcare Center et al.,

            Appellants/
            Cross-Appellees,

v.

Barbara Sears, Director,
Ohio Department of Medicaid,

            Appellee/
            Cross-Appellant.

:
:
:
:
:
:
:
:
:
:

No. 18AP-16
(C.P.C. No. 17CV-1284)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on June 23, 2020

**On brief:**  *Carlile Patchen & Murphy LLP, Maria Mariano Guthrie,* and *Jeffrey J. Patter*, for appellants/cross-appellees. **Argued:**  *Maria Mariano Guthrie.*

**On brief:**  *Dave Yost,* Attorney General*, Rebecca L. Thomas,* and *Justin T. Radic*, for appellee/cross-appellant. **Argued:** *Rebecca L. Thomas.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Appellants/cross-appellees, Peregrine Health Services of Columbus, LLC dba Summit's Trace Healthcare Center and Peregrine Health Services of Cincinnati, LLC dba Oak Pavilion Nursing Center (hereinafter collectively referred to as "Peregrine"), appeal from a December 11, 2017 judgment of the Franklin County Court of Common Pleas denying their petition for a writ of mandamus ordering appellee/cross-appellant, Barbara

Sears, Director of the Ohio Department of Medicaid (hereinafter referred to as "ODM") to distribute critical access incentive payments to them for state fiscal year 2017. Following a bench trial, the trial court entered judgment denying the writ of mandamus, finding Peregrine was not entitled to the writ. For the following reasons, we affirm the trial court's decision denying the requested writ.

{¶ 2} ODM filed a conditional cross-appeal from a November 1, 2017 decision of the Franklin County Court of Common Pleas denying ODM's March 7, 2017 motion to dismiss Peregrine's complaint for failure to state a claim upon which relief may be granted pursuant to Civ.R. 12(B)(6). For the following reasons, we decline to address ODM's cross-appeal, finding it moot.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Overview

{¶ 3} This mandamus action arose out of Peregrine's claim that ODM had denied them critical access incentive payments for which they were eligible under R.C. 5165.15 and 5165.23 for state fiscal year 2017. Peregrine claims the denial was based on ODM's incorrect and unreasonable interpretation of the term "occupancy rate" as described in R.C. 5165.23(A)(2) to determine whether a nursing facility qualifies for such payments.

{¶ 4} ODM is responsible for determining and issuing critical access incentive payments to qualified nursing facilities according to R.C. 5165.15 and 5165.23. Pursuant to R.C. 5165.15, ODM determines how much a Medicaid-funded nursing facility receives and then distributes the funds as a "total per Medicaid day payment rate." This "total per Medicaid day payment rate" is computed by determining the sum of six components, one of which is a critical access incentive payment for qualifying nursing facilities. R.C. 5165.15(A)(5). If a nursing facility qualifies for a critical access incentive payment, then ODM totals the facility's other components under R.C. 5165.15(A)(1) through (4) and (6) and increases the total by five percent. R.C. 5165.23(B). The five percent increase constitutes the critical access incentive payment. R.C. 5165.23(A) provides criteria a facility must meet to receive a critical access incentive payment, one of which is to have an occupancy rate of at least eighty-five percent as of the last day of the calendar year immediately preceding the fiscal year.

{¶ 5}   ODM's decision regarding whether a nursing facility qualifies for a critical access incentive payment is subject to reconsideration when sought by the facility "on the basis of a possible error in the calculation of the rate."  Ohio Adm.Code 5160-3-24.  ODM then issues a written reconsideration decision.  ODM's reconsideration decision is not subject to any administrative remedy under R.C. Chapter 119 or any other provision of the Revised Code; therefore, a mandamus action is Peregrine's only legal remedy.  Mandamus is an appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body.  *State ex rel. Cydrus v. Ohio Public Emps. Retirement Sys.*, 127 Ohio St.3d 257, 2010-Ohio-5770, ¶ 12.

**B.  Facts**

{¶ 6}   The facts of the underlying matter are undisputed.  Peregrine Health Services of Columbus, LLC operates Summit's Trace Healthcare Center, while Peregrine Health Services of Cincinnati, LLC operates Oak Pavilion Nursing Center.  (Feb. 3, 2017 Petition at ¶ 1-2.)   ODM denied critical access incentive payments to Peregrine and Peregrine requested reconsideration.   ODM denied such reconsideration.   Subsequently, on February 3, 2017, Peregrine filed a verified petition for a writ of mandamus seeking a writ to compel ODM to distribute critical access incentive payments to them under R.C. 5165.15(A)(5) and 5165.23 for state fiscal year 2017.

{¶ 7}   The parties agree that the sole issue is the meaning of the term "occupancy rate" as used in R.C. 5165.23(A)(2) to calculate the critical access incentive payment.

{¶ 8}   "Occupancy rate" is a percentage of occupied days divided by available days. (Petition at ¶ 28.)  However, Peregrine argues that the calculation of an "occupancy rate" for purposes of R.C. 5165.23(A)(2) should be calculated by using the number of beds actually in use at the nursing facility that have been certified for Medicaid care and reimbursement (hereinafter referred to as "certified beds") as the denominator in the equation.  ODM argues the determination is the maximum number of beds that the facility was authorized by the Ohio Department of Health to make available or the maximum number of beds that the facility has licenses for and, therefore, could be made available for occupancy in the denominator of the equation (hereinafter referred to as "licensed beds"). (Nov. 16, 2017 Moore Aff. at ¶ 7.)  Peregrine claims that ODM "wrongfully and arbitrarily" denied them the critical access incentive payments based on ODM's incorrect

interpretation of the term "occupancy rate" by using licensed beds rather than certified beds in the calculation.  (Petition at ¶ 32, 34.)

{¶ 9}  It is not uncommon for nursing facilities to have a different number of licenses for beds than the number of actual Medicaid-certified beds.  For example, Summit's Trace had licenses for 201 beds but only had 177 to 180 beds that existed in the facility and could be occupied by a patient.  (Heaphy Feb. 1, 2017 Aff. at ¶ 12, 20.)  Oak Pavilion had licenses for 150 beds but only 130 beds existed and were available to be occupied by patients.  *Id.* at ¶ 32.

{¶ 10}  On March 7, 2017, ODM filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted pursuant to Civ.R. 12(B)(6).  ODM argued its interpretation of occupancy rate was not unreasonable, irrational, or inconsistent with the statutory purpose and, consequently, Peregrine had failed to state a claim for which relief could be granted.

{¶ 11}  On April 4, 2017, Peregrine filed a memorandum in opposition to ODM's motion to dismiss, attaching an affidavit and supporting documents.  On April 17, 2017, ODM filed a reply in support of its motion to dismiss.  On May 3, 2017, Peregrine requested leave to file a sur-reply, which was opposed by ODM by memorandum filed the same day.

{¶ 12}  By journal entry dated November 1, 2017, the trial court denied ODM's motion to dismiss, denied Peregrine's motion for leave to file sur-reply, and set the matter for supplemental briefing and hearing.

{¶ 13}  On November 22, 2017, the trial court conducted a bench trial and, in addition to live testimony, it admitted documentary evidence including the verified petition for a writ of mandamus and the affidavits that had previously been filed.  The trial court qualified as experts all three witnesses that testified during the trial.

{¶ 14}  On December 11, 2017, the trial court issued its decision denying the requested writ.  The trial court noted that the term "occupancy rate" is not defined in R.C. Chapter 5165 and that "[t]he statute does not specifically address whether to use 'licensed' or 'certified' beds to calculate critical access payments under 5165.23(A)(2)." (Dec. 11, 2017 Decision at 5.)  The trial court found R.C. 5165.23(A)(2) ambiguous.  The trial court stated:

> A nursing facility occupancy rate could be calculated using all of its licensed beds, or using only Medicaid certified beds. There are pro's [sic] and con's [sic] to each approach.  If a

facility is remodeling – in order to better serve residents – and takes licensed beds temporarily out of service the occupancy rate will go down if licensed beds are the basis for the computation, perhaps eliminating the critical access incentive payment for a year or more. But, the record suggests a facility that does not meet the 85% occupancy rate may simply be "sitting-on" excess licensed beds, or may even have quality of care issues that keep its population relatively low. Figuring out what approach is best for the public in conducting critical access incentive payment calculations is, therefore, a matter of judgment. The General Assembly did not settle that issue with this statutory language. The Department charged with implementation of the language is left to apply the statutory concept in a sensible manner.

(Decision at 6.)

{¶ 15} The trial court found that it was appropriate to defer to ODM's interpretation of "occupancy rate" for purposes of determining whether a nursing facility qualified for a critical access incentive payment. The trial court found the evidence showed ODM "was acting in a reasonable and good faith manner in implementing the modest legislative guidance on computing an 'occupancy rate' pursuant to R.C. 5165.23(A)(2)." (Decision at 7.) Relying on the holding of *In re Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, ¶ 36 ("when a statute does not prescribe a particular formula or methodology, the appropriate administrative agency has broad discretion in deciding how to implement its duties"), the trial court concluded that ODM "must be allowed" broad discretion in deciding how to implement R.C. 5165.23(A)(2). (Decision at 7.) The trial court concluded that Peregrine had not demonstrated entitlement to a writ of mandamus.

{¶ 16} On January 5, 2018, Peregrine timely appealed from the December 11, 2017 judgment. On January 12, 2018, ODM conditionally cross-appealed from the trial court's entry journalized on November 1, 2017 that denied ODM's motion to dismiss the mandamus action.

## II.  ASSIGNMENTS OF ERROR

{¶ 17} Peregrine presents three assignments of error for review:

[1.] The trial court erred in dismissing [Peregrine's] Writ of Mandamus when the trial court gave improper deference to the Ohio Department of Medicaid's interpretation of R.C. 5165.23.

[2.] The trial court erred when it found that the Ohio Department of Medicaid's interpretation of R.C. 5165.23 was reasonable.

[3.] The trial court abused its discretion when it failed to find that the Ohio Department of Medicaid's denial of the critical access incentive payments was unreasonable, arbitrary and/or unconscionable.

## III. CONDITIONAL CROSS-APPEAL

{¶ 18} ODM filed a conditional cross-appeal, requesting that the trial court's decision denying ODM's Civ.R. 12(B)(6) motion to dismiss be reversed in the event this court grants the relief sought by Peregrine:

The lower court incorrectly denied the Department's motion to dismiss based on failure to state a claim upon which relief could be granted. (*See* Comm. Pl. 11/1/2017 Journal Entry at 3.)

## IV. LAW AND DISCUSSION – APPEAL

### A. Mandamus

{¶ 19} To be entitled to relief in mandamus, a relator must demonstrate that (1) relator has a clear legal right to the relief prayed for, (2) respondent is under a clear legal duty to perform the act prayed for, and (3) relator has no plain and adequate remedy in the ordinary course of law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28, 29 (1983); *PBP, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-36, 2013-Ohio-4344. "Mandamus is an extraordinary remedy which is to be exercised with caution and issued only when the right is clear." *Id.* at ¶ 13, citing *State ex rel. Rittner v. Bumb*, 6th Dist. No. F-07-017, 2007-Ohio-5319, ¶ 6. Therefore, in order for this court to issue a writ of mandamus in this matter, Peregrine must establish a clear legal right to critical access incentive payments for state fiscal year 2017, a clear legal duty on the part of ODM to issue such payments to them, and the lack of an adequate remedy in the ordinary course of law.

{¶ 20} There is no dispute that ODM had a clear legal duty to determine and pay critical access incentive payments to qualified nursing facilities for state fiscal year 2017. Nor is there any dispute that, because Ohio Adm.Code 5160-3-24 bars any administrative remedy of ODM's reconsideration decision, this mandamus action is Peregrine's only remedy. Consequently, the remedy of a writ of mandamus is appropriate in this matter if

Peregrine can demonstrate that ODM improperly and unreasonably calculated the critical access incentive payments at issue here.

## B. Standard of Review

{¶ 21} The parties disagree on the standard of review that applies in determining whether the trial court erred in entering judgment in favor of ODM. ODM cites this court's holding in *State ex rel. BDFM Co. v. Ohio Dept. of Transp.*, 10th Dist. No. 11AP-1094, 2013-Ohio-107, which supports the proposition that a trial court's decision in a mandamus action is generally reviewed for abuse of discretion. ODM also asserts that this court should defer to ODM's reasonable construction of its statutes and rules, regardless of the standard of review applied.

{¶ 22} Peregrine challenges ODM's argument that our standard of review is an abuse of discretion review and instead argues that a de novo review should be employed. Peregrine acknowledges that, generally, the standard of review is an abuse of discretion. ODM has conceded, however, that "[t]he question presented here is purely legal; there are no disputed material facts." *See* ODM Combined Brief at 1. Peregrine relies on this court's holding in *State ex rel. V&A Risk Servs. v. State Bur. of Workers' Comp.,* 10th Dist. No. 11AP-742, 2012-Ohio-3583, ¶ 19 (where a "stipulated record presents a question of law, appellate courts review a writ of mandamus issued by a trial court de novo"), to support their position that de novo is the appropriate standard of review here.

{¶ 23} Having independently reviewed the record and the law regarding the standard of review in a case such as this, we find de novo review appropriate. The parties and trial court agree there are no material disputed facts, and the only issue for review is whether ODM's interpretation of R.C. 5165.23(A)(2) was proper and reasonable, which is purely a question of law. "Statutory interpretation is a question of law subject to de novo review." *Silver Lining Group EIC Morrow Co. v. Ohio Dept. of Edn. Autism Scholarship Program*, 10th Dist. No. 16AP-398, 2017-Ohio-7834, ¶ 33.

## C. Assignments of Error

{¶ 24} Because they are interrelated, we address Peregrine's assignments of error together. Peregrine asserts the trial court erred by affording improper deference to ODM's interpretation of R.C. 5165.23, which resulted in its finding that ODM's interpretation of R.C. 5165.23 was reasonable. Peregrine asserts that ODM's interpretation of R.C. 5165.23

is unreasonable and resulted in an improper denial of critical access incentive payments to Peregrine for fiscal year 2017.

{¶ 25} As recognized, there are no disputed facts. Both Peregrine and ODM agree Peregrine satisfied three of the four criteria of R.C 5165.23 in order to receive incentive payments. The parties do not dispute the data submitted by Peregrine that established the number of licensed beds and the number of certified beds. Therefore, the sole issue presented to the trial court was whether the calculation of the occupancy rate is determined by using the number of licensed beds, as argued by ODM, or by using the number of certified beds, as argued by Peregrine.

{¶ 26} The parties agree that, in 2012,[1] the Ohio General Assembly enacted critical access incentive payments that could be awarded to nursing facilities located in highly distressed urban and rural communities to encourage the nursing facilities to remain in those communities, thereby keeping "vital and needed senior health services in place" in those communities. (Petition at ¶ 11-12; ODM Mar. 7, 2017 Mot. to Dismiss at 2.) The parties likewise agree the critical access incentive payments "were put in place to address the potential for a lack of access to healthcare by both rural and inner-city residents, a high proportion of whom are poor and chronically ill and—thus—more likely to be Medicaid recipients," and the critical access incentive payments make it economically feasible for the nursing facilities to remain in their communities, where they also help by providing significant local employment. (Mar. 7, 2017 ODM Mot. to Dismiss at 2, citing Petition at ¶ 11-12.)

{¶ 27} R.C. 5165.15 establishes the total per Medicaid day payment rate, including the critical access incentive payment, that ODM shall pay a nursing facility during a state fiscal year. Calculation of the Medicaid day payment rate for fiscal year 2017 required ODM to determine the sum of all the following in accordance with R.C. 5165.15(A):

> (1) The per medicaid day payment rate for ancillary and support costs determined for the nursing facility under section 5165.16 of the Revised Code;

---

[1] The statute, previously codified as R.C. 5111.246 but now codified as R.C. 5165.23, became effective on September 10, 2012.

(2) The per medicaid day payment rate for capital costs determined for the nursing facility under section 5165.17 of the Revised Code;

(3) The per medicaid day payment rate for direct care costs determined for the nursing facility under section 5165.19 of the Revised Code;

(4) The per medicaid day payment rate for direct care costs determined for the nursing facility under section 5165.19 of the Revised Code;

(5) If the nursing facility qualifies as a critical access nursing facility, the nursing facility's critical access incentive payment paid under section 5165.23 of the Revised Code.

{¶ 28} In order for a nursing facility to qualify for the critical access incentive payment provided for in R.C. 5165.15(A)(5), ODM must determine that the nursing facility satisfies the requirements of R.C. 5165.23(A), which provided for state fiscal year 2017, as follows:

(A) Each state fiscal year, the department of medicaid shall determine the critical access incentive payment for each nursing facility that qualifies as a critical access nursing facility. To qualify as a critical access nursing facility for a state fiscal year, a nursing facility must meet all of the following requirements:

(1) The nursing facility must be located in an area that, on December 31, 2011, was designated an empowerment zone under the "Internal Revenue Code of 1986," section 1391, 26 U.S.C. 1391.

*(2) The nursing facility must have an occupancy rate of at least eighty-five per cent as of the last day of the calendar year immediately preceding the state fiscal year.*

(3) The nursing facility must have a medicaid utilization rate of at least sixty-five per cent as of the last day of the calendar year immediately preceding the state fiscal year.

(4) The nursing facility must have been awarded at least five points for meeting accountability measures under section 5165.25 of the Revised Code for the fiscal year and at least one of the five points must have been awarded for meeting the accountability measures identified in divisions (C)(9), (10), (11), (12), and (14) of section 5165.25 of the Revised Code.

(Emphasis added.)   H.B. No. 483, as enacted by the 130th General Assembly, effective Sept. 15, 2014.

{¶ 29} "The primary goal of statutory construction is to ascertain and give effect to the legislature's intent in enacting the statute.  The court must first look to the plain language of the statute itself to determine the legislative intent."  (Citations omitted.)  *State v. Bundy*, 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 46.  We must consider the statutory language in context, construing words and phrases according to the rules of grammar and common usage.  *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, ¶ 16, citing *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, ¶ 34.

{¶ 30} A court may only interpret a statute when " 'the words of a statute are ambiguous, uncertain in meaning, or conflicting.' "  *In re Brooks*, 136 Ohio App.3d 824, 829 (10th Dist.2000), quoting *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81 (1997).  Ambiguity exists when the language of a statute is susceptible to more than one interpretation.  *Silver Lining Group*, 2017-Ohio-7834, at ¶ 35, citing *Columbus v. Mitchell*, 10th Dist. No. 16AP-322, 2016-Ohio-7873, ¶ 6.  R.C. 1.49 provides that when a statute is ambiguous, a court may consider "other matters," such as the object sought to be attained, the legislative history, the consequence of a particular construction, and the administrative construction of the statute.

{¶ 31} ODM asserts that R.C. 5165.23(A)(2) is ambiguous because it does not define "occupancy rate," while that term is defined in other sections in R.C. Chapter 5165, including R.C. 5165.16 and 5165.17.  ODM argues that its interpretation is uniform within the chapter.  We find that R.C. 5165.23(A)(2) is ambiguous because it does not specify how that rate is to be determined, and it is susceptible to more than one reasonable interpretation by using either licensed beds or certified beds.  Here, the trial court expressly noted the lack of legislative guidance on the formula or methodology to be applied in calculating occupancy rate for purposes of determining critical access incentive payments.

{¶ 32} " 'If a statute provides an administrative agency authority to perform a specified act but does not provide the details by which the act should be performed, the agency is to perform the act in a reasonable manner based upon a reasonable construction of the statutory scheme.' "  *Silver Lining Group* at ¶ 49, quoting *Cosby v. Franklin Cty.*

*Dept. of Job & Family Servs.*, 10th Dist. No. 07AP-41, 2007-Ohio-6641, ¶ 38. If the agency interprets the statute in a way that " 'fills a gap or defines a term in a reasonable way in light of the Legislature's design [, such construction] controls, even if it is not the answer the court would have reached in the first instance.' " *Id.* at ¶ 49, citing *Cosby* at ¶ 38, quoting *Regions Hosp. v. Shalala*, 522 U.S. 448, 450 (1998).

{¶ 33} "[A] 'legislative gap' is not 'equivalent to a lack of authority for the agency to act.' " *Silver Lining Group* at ¶ 50, quoting *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 289 (2001). Moreover, " 'the power of an administrative agency to administer a * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly,' by the legislature." (Emphasis omitted.) *Northwestern Ohio Bldg. & Constr. Trades Council* at 289, quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974).

{¶ 34} R.C. 5165.23 does not specify whether ODM should use licensed beds or certified beds when calculating occupancy rate. ODM reasonably filled the gap and determined it should use licensed beds to determine the occupancy rate. The General Assembly delegated the determination of which nursing facilities were eligible for the critical access incentive payments and required ODM to create the standards for that determination.

{¶ 35} ODM argues that using licensed beds prevents facilities from manipulating the numbers in order to meet the occupancy requirement. By using certified beds, it could provide an incentive to facilities to choose to remove Medicaid-certified beds out of service, thereby decreasing the number of beds used in the denominator of the occupancy-rate fraction in order to artificially inflate the occupancy rate above 85 percent. It could encourage facilities in empowerment zones to lower the number of available beds and thereby result in a decrease, rather than an increase, in the local access to nursing facilities in those empowerment zones. (Appellee Combined Brief at 4-5; Tr. 88-95.)

{¶ 36} Peregrine argues that using licensed beds to determine occupancy rate is contrary to ODM's prior administrative practices. Under R.C. 5165.34, if a facility has a patient who is temporarily absent due to a hospital stay or other reasons, Medicaid can pay that facility 50 percent of the Medicaid day rate if the facility has an occupancy rate exceeding 95 percent. Occupancy rate is not defined in that section. In determining

occupancy rate for temporary absences under R.C. 5165.34, ODM initially used certified beds for a few years (approximately 2011 to 2016). However, both ODM employees who testified stated that using certified beds was an error, and ODM corrected the error and began using licensed beds under R.C. 5165.34. (Moore Tr. at 59; Dickerson Tr. at 88-89.) However, since 2012 when R.C. 5165.23 became effective, ODM has consistently interpreted occupancy rate using licensed beds for the critical access incentive payments. (Dickerson Tr. at 88.) Moreover, Peregrine conceded at trial that ODM had always used licensed beds to determine occupancy rate under R.C. 5165.23. (Tr. at 13-15.)

{¶ 37} Further, ODM argues occupancy rate is now interpreted consistently throughout R.C. Chapter 5165 because ODM also uses licensed beds in the formula for occupancy rate in both R.C. 5165.16 and 5165.17. The term "occupancy rate" is defined in R.C. 5165.16 and 5165.17, and R.C. 5165.16 provides, as follows:

> (D)(2) For the purpose of determining a nursing facility's occupancy rate under division (D)(1)(a) of this section, the department shall include any beds that the nursing facility removes from its medicaid-certified capacity unless the nursing facility also removes the beds from its licensed bed capacity.[2]

{¶ 38} One of ODM's experts, Roger Allan Dickerson, Deputy Director of the Rate Setting and Cost-Setting Section of ODM, testified that if the General Assembly intended ODM to use certified beds to calculate the occupancy rate for the critical access incentive payments, the General Assembly would have used such language in R.C. 5165.23. (Tr. at 87-88.) Dickerson testified Medicaid-certified beds is a subset of licensed beds (all Medicaid-certified beds must first be licensed beds), and if the General Assembly had wanted "occupancy rate" to mean Medicaid-certified beds, they would have used "Medicaid-certified" as the subset. (Tr. at 87-88.)

{¶ 39} Further, ODM argues that applying the same definition to R.C. 5165.23 as in R.C. 5165.16 and 5165.17 furthers the purposes that the General Assembly intended which was to ensure access to nursing facility healthcare for residents of underserved rural and inner-city areas. ODM contends that providing incentive payments only to nursing

---

[2] R.C. 5165.17 uses similar language as R.C. 5165.16, as follows: "(D)(3) For the purpose of determining a nursing facility's occupancy rate under division (D)(2)(a) of this section, the department shall include any beds that the nursing facility removes from its Medicaid-certified capacity after June 30, 2005, unless the nursing facility also removes the beds from its licensed bed capacity."

facilities with high occupancy rates provides that the facilities that are used will be retained, and access to such facilities will be assured.  (ODM Combined Brief at 4.)

{¶ 40} Peregrine argues that R.C. 5165.16 and 5165.17 are rate-setting statutory provisions and thus not closely related statutes to R.C. 5165.23, an add-on incentive provision; therefore, we should not consider these statutes *in pari materia*.  "It is a basic rule of statutory construction that where sections of a statute are *in pari materia,* they shall be construed together so as to give full force and effect to the legislative intent."  *State v. Parks*, 13 Ohio App.3d 85, 86 (10th Dist.1983).  All statutes relating to the same subject matter must be read *in pari materia*, and construed together, so as to give the proper force and effect to each and all such statutes."  *State v. Cook*, 128 Ohio St.3d 120, 2010-Ohio-6305, ¶ 45.  R.C. Chapter 5165 is titled Nursing Facility Services, and all three of these sections are found in this same chapter of the Revised Code and involve components of Medicaid rates paid to nursing facilities.  They involve the same general subject matter and address similar subjects.  The sections are not so unrelated as to make *in pari materia* review inappropriate.

{¶ 41} Generally, where there is ambiguity, " '[a] reviewing court, in interpreting a statute, "must give due deference to an administrative interpretation formulated by an agency which has accumulated substantial expertise, and to which the legislature has delegated the responsibility of implementing the legislative command." ' "  *Northside Amateur Boxing School Bingo Club v. Hamilton Cty. Gen. Health Dist.*, 184 Ohio App.3d 596, 2009-Ohio-5122, ¶ 17 (10th Dist.), quoting *In re 138 Mazal Health Care, Ltd.*, 117 Ohio App.3d 679, 685 (10th Dist.1997), quoting *State ex rel. McLean v. Indus. Comm.*, 25 Ohio St.3d 90 (1986).  Furthermore, "in order to sustain an agency's application of a statutory term, a reviewing court ' "need not find that its construction is the only reasonable one." ' "  *Id.*, quoting 138 *Mazal Health Care* at 685, quoting *Udall v. Tallman,* 380 U.S. 1, 16 (1965), *superseded by statute on other grounds*, quoting *Unemp. Comp. Comm. of Territory of Alaska v. Aragon*, 329 U.S. 143 (1946).  In the administrative law context, unless an administrative agency's interpretation of a statute that it has a duty to enforce is unreasonable, it will not be reversed.  *Warren v. Morrison*, 10th Dist. No. 16AP-372, 2017-Ohio-660, ¶ 10, citing *State ex rel. Clark v. Great Lakes Constr. Co.*, 99 Ohio St.3d 320, 2003-Ohio-3802, ¶ 10, citing *Northwestern Ohio Bldg. & Constr. Trades Council*, 92 Ohio

St.3d at 287.  Thus, if the administrative agency's interpretation is reasonable and consistent with the underlying legislative intent, this court must defer to the agency's interpretation and uphold it.  *Id.*, citing *Oyortey v. State Med. Bd. of Ohio*, 10th Dist. No. 12AP-431, 2012-Ohio-6204, ¶ 17.

{¶ 42} Based on the foregoing reasons, we find that ODM's interpretation of occupancy rate under R.C. 5165.23(A)(2) that resulted in denying critical access incentive payments to Peregrine for state fiscal year 2017 was not unreasonable and not contrary to law.  We find, therefore, that the trial court did not err in deferring to ODM's interpretation and denying Peregrine the writ of mandamus.  Peregrine's three assignments of error are overruled.

## V.  LAW AND DISCUSSION – ODM'S CONDITIONAL CROSS-APPEAL

{¶ 43} ODM argues that the trial court improperly denied its Civ.R. 12(B)(6) motion to dismiss Peregrine's petition for a writ of mandamus for failure to state a claim upon which relief could be granted.  ODM posits that Peregrine is barred from stating a valid claim for writs of mandamus compelling ODM to pay Peregrine critical access incentive payments because Peregrine did not meet the statutory criteria for such payments, based on ODM's interpretation of the term occupancy rate as it is used in R.C. 5165.23.  (ODM's Combined Brief in passim.)  However, ODM raised this assignment of error only conditionally upon our granting Peregrine's requested relief.  Since we have not done so, we decline to address ODM's conditional assignment of error as it is moot.

## VI.  CONCLUSION

{¶ 44} Based on the foregoing, we overrule Peregrine's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas denying the requested writ of mandamus.  Additionally, we decline to address ODM's conditional assignment of error on cross-appeal as it is moot.

*Judgment affirmed.*


LUPER SCHUSTER, J., concurs.
BRUNNER, J., dissents.

BRUNNER, J., dissenting.

{¶ 45} I respectfully dissent from the decision of the majority. The matter before us presents an appeal and a cross-appeal on a question of law in an action for a writ of mandamus. Appellants/cross-appellees, Peregrine Health Services of Columbus, LLC dba Summit's Trace Healthcare Center and Peregrine Health Services of Cincinnati, LLC dba Oak Pavilion Nursing Center (hereinafter collectively referred to as "Peregrine" and "they" or "them"), appeal from a December 11, 2017 judgment of the Franklin County Court of Common Pleas denying their petition for a writ of mandamus ordering appellee/cross-appellant, Barbara Sears, Director of the Ohio Department of Medicaid (hereinafter referred to as "ODM") to distribute critical access incentive payments to them for state fiscal year 2017. The trial court entered judgment following a bench trial, having found Peregrine not entitled to the special writ because they had not proved that ODM's interpretation of R.C. 5165.23(A)(2), the statutory provision at issue, was unreasonable, arbitrary, or unconscionable. For the reasons that follow, I would reverse the trial court's decision denying the requested writ.

{¶ 46} The majority in this case denies for mootness ODM's conditional cross-appeal from a November 1, 2017 decision of the Franklin County Court of Common Pleas denying ODM's March 7, 2017 motion to dismiss Peregrine's complaint for failure to state a claim on which relief may be granted pursuant to Civ.R. 12(B)(6). ODM's cross-appeal is conditioned on this Court granting relief to Peregrine. I concur with denying ODM's cross-appeal but for reasons based on its merits and not for mootness. For the reasons that follow, in addition to denying ODM's cross-appeal, I would also affirm the trial court's decision denying ODM's motion to dismiss the underlying mandamus action.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Overview

{¶ 47} While some of the facts stated in this dissenting opinion may be duplicative of those stated by the majority, I restate them for the purposes of cogency of presentation of how I view the law as applying here and based on my analysis of the record.

{¶ 48} This mandamus action arose out of Peregrine's claim that ODM had denied them critical access incentive payments for which they were eligible under R.C. 5165.15(A)(5) and 5165.23 for state fiscal year 2017. Peregrine claims the denial was based on ODM's incorrect and unreasonable interpretation of the term "occupancy rate" as

described in R.C. 5165.23(A)(2) to determine whether a nursing facility qualifies for such payments.

{¶ 49} A review of the critical access incentive payment that is the crux of the underlying matter is helpful at this juncture.  Critical access incentive payments are reserved for nursing facilities that satisfy the criteria of R.C. 5165.23(A).  To receive a critical access incentive payment, a nursing facility must be located in an "empowerment zone" as discussed under the "Internal Revenue Code of 1986," 26 U.S.C. 1391-92.  R.C. 5165.23(A)(1).  The parties agree Peregrine satisfies this criterion. Second, a nursing facility must have an occupancy rate of at least 85 percent as of the last day of the calendar year immediately preceding the state fiscal year.  R.C. 5165.23(A)(2).  This second criterion is the disputed issue here, because the denominator for determining that percentage may be larger or smaller, depending on whether licensed beds (all beds possible) or certified beds (beds physically existent at a facility designated for use by Medicaid patients) is used.  Third, a nursing facility must have a Medicaid utilization rate of at least 65 percent as of the last day of the calendar year immediately preceding the state fiscal year.  R.C. 5165.23(A)(3).  There is no dispute between the parties that Peregrine satisfies the third criterion.

{¶ 50} ODM determines how much a Medicaid-funded nursing facility receives then based on a "total per medicaid day payment rate."  R.C. 5165.23(A); R.C. 5165.15.  This "total per medicaid day payment rate" is computed by determining the sum of six variables, one of which is a critical access incentive payment for qualifying nursing facilities.  R.C. 5165.15(A).  If a nursing facility qualifies for a critical access incentive payment, then ODM totals the facility's other variables under R.C. 5165.15(A) and increases the total by five percent.  R.C. 5165.23(B).  The five percent increase constitutes the critical access incentive payment.

{¶ 51} ODM's decision about whether a nursing facility qualifies for a critical access incentive payment is subject to reconsideration when sought by the facility "on the basis of possible error of the calculation rate."  Ohio Adm.Code 5160-3-24.  ODM then issues a written reconsideration decision. ODM's reconsideration decision is not subject to any administrative remedy under R.C. Chapter 119 or any other provision of the Revised Code, resulting in this mandamus action being Peregrine's only legal remedy.  Mandamus is an

appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body. *State ex rel. Cydrus v. Ohio Public Emps. Retirement Sys.*, 127 Ohio St.3d 257, 2010-Ohio-5770, ¶ 12.

## B. Facts

{¶ 52} Peregrine Health Services of Columbus, LCC operates Summit's Trace Healthcare Center, while Peregrine Health Services of Cincinnati, LLC operates Oak Pavilion Nursing Center. (Feb. 3, 2017 Petition at ¶ 1-2.) ODM is responsible for determining and issuing critical access incentive payments to qualified nursing facilities according to R.C. 5165.15 and 5165.23. On February 3, 2017, Peregrine filed a verified petition for a writ of mandamus seeking a writ to compel ODM to distribute critical access incentive payments to them under R.C. 5165.15(A)(5) and 5165.23 for state fiscal year 2017.

{¶ 53} The facts of the underlying matter are undisputed. The parties agree that the sole issue is the meaning of the term "occupancy rate" as used in R.C. 5165.23(A)(2) to calculate the critical access incentive payment under that statute. Peregrine argues that the calculation of an "occupancy rate" for purposes of R.C. 5165.23(A)(2) is determined by using the number of beds actually in use at the nursing facility that have been certified for Medicaid care and reimbursement (hereinafter referred to as "certified beds"). ODM argues the determination is based on the often greater number of beds a nursing facility is licensed to have (hereinafter referred to as "licensed beds"), but that is not necessarily in use.

{¶ 54} Peregrine claims that ODM "wrongfully and arbitrarily" denied them the critical access incentive payments based on ODM's incorrect interpretation of the term "occupancy rate." (Petition at ¶ 32, 34.) Peregrine attached in support of their petition the affidavit of Jeffrey Heaphy, a Nursing Home Administrator ("NHA") Partner at Plant & Moran, PLLC, who specializes in Medicaid and Medicare and the health care industry and who prepared certain Medicaid Cost Reports for Peregrine.

{¶ 55} On March 7, 2017, ODM filed a motion to dismiss the complaint for failure to state a claim on which relief may be granted pursuant to Civ.R. 12(B)(6). ODM argued its interpretation of occupancy rate was not unreasonable, irrational, or inconsistent with the statutory purpose and, consequently, that Peregrine had failed to state a claim for which relief could be granted.

{¶ 56} On April 4, 2017, Peregrine filed a memorandum in opposition to ODM's motion to dismiss with an attached new affidavit of the same Jeffrey Heaphy, along with supporting documents. On April 17, 2017, ODM filed a reply in support of its motion to dismiss. On May 3, 2017, Peregrine requested leave to file a sur-reply, which was opposed by ODM by memorandum filed the same day.

{¶ 57} By journal entry dated November 1, 2017, the trial court denied ODM's motion to dismiss, denied Peregrine's motion for leave to file sur-reply, and set the matter for supplemental briefing and hearing.

{¶ 58} On November 22, 2017, the trial court conducted a bench trial at which it admitted the following documentary evidence: the verified petition for a writ of mandamus; the affidavits of Jeffrey Heaphy that had been filed on February 3 and April 4, 2017; the affidavits of Peregrine's counsel authenticating certain exhibits; the affidavit of Terry Moore, section chief for ODM's long-term care, rate-setting, and managed care rate-setting section; biographical information on witnesses Heaphy, Moore, and Roger Allan Dickerson, ODM's deputy director of ODM's rate-setting and cost-setting section; and certain other exhibits offered by the parties. The trial court also admitted and considered the testimony of Heaphy, Moore, and Dickerson. The transcript of the hearing and the admitted exhibits are part of the record of this appeal.

{¶ 59} On December 11, 2017, the trial court issued its decision denying the requested writ. The trial court found that all three witnesses who testified at the hearing were qualified as expert witnesses. Heaphy qualified "as an expert on the nursing home industry, and specifically, on third-party payer reimbursement arrangements." (Dec. 11, 2017 Decision at 3.) Moore qualified as an expert on Medicaid-related matters such as rate setting, managed care rate setting, developing regulations for the Ohio Administrative Code, and working "to 'translate' Medicaid statutes into explanations the [ODM's] IT personnel can understand in writing programs for accounting and other record keeping." *Id.* at 4. The trial court stated in its decision that Moore "offered very credible testimony," and that she "demonstrated a solid understanding of the subtle issues involved in calculations such as those challenged in this case." *Id.* Dickerson qualified as an expert based on his 15 years of Medicaid experience. The trial court stated in its decision that Dickerson "essentially confirmed Ms. Moore's explanation of how the relevant statute is

used, that [ODM] has never used anything except 'licensed' beds in calculating the occupancy rate of a facility for critical access payments, and that [ODM] is proceeding in a way it deems both logical and consistent with the legislature's language and intent." *Id. a*t 5.

{¶ 60} The trial court noted that the term "occupancy rate" is not defined in R.C. Chapter 5165, and that "[t]he statute does not specifically address whether to use 'licensed' or 'certified' beds to calculate critical access payments under 5165.23(A)(2)." (Decision at 5.) The trial court found R.C. 5165.23(A)(2) to be ambiguous. The trial court stated:

> A nursing facility occupancy rate could be calculated using all of its licensed beds, or using only Medicaid certified beds. There are pro's [sic] and con's [sic] to each approach. * * * Figuring out what approach is best for the public in conducting critical access incentive payment calculations is, therefore, a matter of judgment. The General Assembly did not settle that issue with this statutory language. The Department charged with implementation of the language is left to apply the statutory concept in a sensible manner.

(Decision at 6.)

{¶ 61} The trial court found that it was appropriate to defer to ODM's interpretation of "occupancy rate" for purposes of determining whether a nursing facility qualified for a critical access incentive payment. The trial court found the evidence showed ODM "was acting in a reasonable and good faith manner in implementing the modest legislative guidance on computing an 'occupancy rate' pursuant to R.C. 5165.23(A)(2)." (Decision at 7.) Relying on the holding of *In re Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, ¶ 36 ("when a statute does not prescribe a particular formula or methodology, the appropriate administrative agency has broad discretion in deciding how to implement its duties"), the trial court concluded that ODM "must be allowed" broad discretion in deciding how to implement R.C. 5165.23(A)(2). (Decision at 7.)

{¶ 62} The trial court was not persuaded by Peregrine's argument that ODM had changed its interpretation, previously using another formula, and that this was material to its determination of this matter.

> Principles of waiver or estoppel do not apply against the state or its agencies. *Silver Lining* [*Group EIC Morrow Co. v. Ohio Dept. of Edn. Autism Scholarship Program*, 10th Dist. No. 16AP-398, 2017-Ohio-7834], ¶ 54. Thus, the fact the [ODM]

changed its interpretation of another formula – which the court accepts was done in good faith based upon the review that their original formula was mistaken – does nothing to demonstrate that the consistent interpretation applied to R.C. 5165.23 is unlawful.

(Decision at 7.)

{¶ 63} The trial court then concluded that Peregrine had not demonstrated entitlement to a writ of mandamus:

"It is a fundamental tenet of administrative law that an agency's interpretation of a statute that it has a duty to enforce will not be overturned unless the interpretation is unreasonable." *State ex rel. Clark v. Great Lakes Constr. Co.*, 99 Ohio St.3d 320, 2003-Ohio-3802, ¶ 10 and cases cited. To prove an abuse of discretion, the agency interpretation must be "unreasonable, arbitrary, or unconscionable." That plainly is not true here. [Peregrine] have not demonstrated they are entitled to a Writ.

(Decision at 8.)

{¶ 64} On January 5, 2018, Peregrine timely appealed from the December 11, 2017 judgment. On January 12, 2018, ODM conditionally cross-appealed from the trial court's entry journalized on November 1, 2017 that denied ODM's motion to dismiss the mandamus action.

## II. LAW AND DISCUSSION – APPEAL

{¶ 65} In addition to the parties' disagreement on the standard of review this Court should apply in determining whether the trial court erred in entering judgment in favor of ODM,[3] ODM argues that our standard of review is abuse of discretion. It also asserts that this Court should defer to ODM's reasonable construction of its statutes and rules, regardless of the standard of review applied in this matter:

Whatever standard of review is being applied, "[a]n agency's interpretation of a statute that governs its actions should be given deference so long as the interpretation is not irrational, unreasonable or inconsistent with the statutory purpose." See, e.g., *Morning View Care Center-Fulton v. Ohio Dept. of*

---

[3] ODM cites this Court's holding in *State ex rel. BDFM Co. v. Ohio Dept. of Transp.*, 10th Dist. No. 11AP-1094, 2013-Ohio-107, which supports the proposition that a trial court's decision in a mandamus action is generally reviewed for abuse of discretion.

> *Human Servs.*, 148 Ohio App.3d 518, 2002-Ohio-2878, ¶ 43
> (10th Dist.).

(ODM Combined Brief at 12.)

{¶ 66} Peregrine argues for de novo review but acknowledges that, generally, the standard of review is abuse of discretion. ODM has conceded, however, and we agree that "[t]he question presented here is purely legal; there are no disputed material facts." *See* ODM Combined Brief at 1. Peregrine relies on this Court's holding in *State ex rel. V&V Risk Servs. v. State Bur. of Workers' Comp.,* 10th Dist. No. 11AP-742, 2012-Ohio-3583 (where a "stipulated record presents a question of law, appellate courts review a writ of mandamus issued by a trial court de novo"), to support their position that de novo is the appropriate standard of review here. Peregrine also relies on *Cincinnati Entertainment Assocs., Ltd. v. Bd. of Commrs.,* 141 Ohio App.3d 803 (1st Dist.2001) for de novo review. In *Cincinnati Entertainment Assocs., Ltd.*, the First District Court of Appeals applied de novo review to a trial court's grant of writ of mandamus. "While the court recognized that in certain cases the abuse of discretion standard was used for appellate review of writ of mandamus, such review is 'limited to their particular circumstances.' [*Cincinnati Entertainment Assocs., Ltd.*] at 810. However, when faced with a stipulated record and contract interpretation, such [statutory] construction is a matter of law, which is reviewed *de novo.*" (Emphasis sic.) (Peregrine Brief at 20.)

{¶ 67} Additionally, Peregrine cites *State v. McKelvey*, 151 Ohio App.3d 673 (7th Dist.2003) in support of de novo review. In *McKelvey*, the Seventh District Court of Appeals applied the de novo standard in a mandamus review where the parties had stipulated to the underlying facts, and the issue on appeal was the trial court's interpretation of a statute. *Id.* at 675. The *McKelvey* court held that, "[a]s the construction of a statute is a question of law, not fact, a trial court's interpretation of a statute is not entitled to deference on appeal. Thus, we review the trial court's decision to grant the writ of mandamus de novo." (Internal citations omitted.) *Id.* Finally, Peregrine cites *State ex rel. Manley v. Walsh*, 142 Ohio St.3d 384, 2014-Ohio-4563, in which the Supreme Court of Ohio reviewed a denial of a writ of mandamus on a de novo standard notwithstanding the general rule that the standard of review in a mandamus case is abuse of discretion.

{¶ 68} Having similarly conducted an independent review of the record and the law regarding the standard of review in a case such as this, I agree with the majority that de

novo review is appropriate. There are no material disputed facts and the only issue for review is whether ODM's interpretation of R.C. 5165.23(A)(2) was proper and reasonable, which is purely a question of law. "Statutory interpretation is a question of law subject to de novo review." *Silver Lining Group EIC Morrow Co. v. Ohio Dept. of Edn. Autism Scholarship Program*, 10th Dist. No. 16AP-398, 2017-Ohio-7834, ¶ 33.

{¶ 69} I would address Peregrine's assignments of error together, as they are so closely related that discussing them individually would result in unnecessary repetition and redundancy.

{¶ 70} Peregrine asserts the trial court abused its discretion[4] by affording improper deference to ODM's interpretation of R.C. 5165.23—an error of law—that resulted in its finding that ODM's interpretation of R.C. 5165.23 was reasonable, all of which underlay ODM's denial of the critical access incentive payments as being unreasonable, arbitrary, and/or unconscionable. Peregrine contends that this led the trial court to conclude that Peregrine was not entitled to a writ of mandamus because it had failed to demonstrate that ODM had a duty to perform the act requested—the payment of critical access incentive payments to Peregrine.

{¶ 71} The statute at issue, R.C. 5165.23(A), provides: "Each fiscal year, the department of medicaid shall determine the critical access incentive payment for each nursing facility that qualifies as a critical access nursing facility." Under Ohio Adm.Code 5160-3-24, Peregrine may request reconsideration from ODM of a prospective nursing facility rate on the basis of possible error in the calculation of the rate. *Id.* This section further provides that "ODM's decision at the conclusion of the rate reconsideration process

---

[4] The modern edition of *Black's Law Dictionary*, defines abuse of discretion so as to fully take into account the fact that an error of law constitutes an abuse of discretion. It states that an abuse of discretion is "[a]n adjudicator's failure to exercise sound, reasonable, *and legal* decision-making," or "[a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, *illegal, or* unsupported by the evidence." (Emphasis added.) *Black's Law Dictionary* 12 (10th Ed.2014). Moreover, courts that have directly considered the matter have invariably concluded that a court does not have discretion to violate the law. *See State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 15-26 (2d Dist.) (discussing the varying formulations of what constitutes abuse of discretion and concluding "[n]o court -- not a trial court, not an appellate court, nor even a supreme court -- has the authority, within its discretion, to commit an error of law"); *see also, e.g., State v. Robinson*, 10th Dist. No. 17AP-707, 2018-Ohio-1166, ¶ 7; *State v. Moncrief*, 10th Dist. No. 13AP-391, 2013-Ohio-4571, ¶ 7. As Justice O'Donnell of the modern Supreme Court of Ohio has opined, " '[a] court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts.' " *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, ¶ 49 (O'Donnell, J., dissenting), quoting *Doe v. Natl. Bd. of Med. Examiners*, 199 F.3d 146, 154 (3d Cir.1999).

shall not be subject to any administrative proceedings under Chapter 119. or any other provision of the Revised Code." Ohio Adm.Code 5160-3-24(B).

{¶ 72} Both Peregrine and ODM agree that Peregrine satisfied two of the three criteria of R.C 5165.23 in order to receive incentive payments. The parties agree that Peregrine facilities were both located in an empowerment zone in satisfaction of R.C. 5165.23(A)(1). The parties also agree that Peregrine met the Medicaid utilization rate of at least 65 percent as set forth in R.C. 5165.23(A)(3). The parties do not dispute the data submitted by Peregrine that established the number of licensed beds and the number of certified beds. Thus, the sole issue presented to the trial court was whether the calculation of the occupancy rate is determined by using the number of licensed beds, as argued by ODM, or by using the number of certified beds, as argued by Peregrine.

{¶ 73} The term "occupancy rate" is not defined in R.C. 5165.23. Peregrine argues it satisfied the requirement of R.C. 5165.23(A)(2) in having an occupancy rate of at least 85 percent for fiscal year 2017, and thereby being eligible for critical access incentive payments provided for in R.C. 5165.23. Peregrine disputes how ODM calculated the critical access payments for fiscal year 2017, arguing that ODM incorrectly based its calculation on the number of licensed beds, rather than the lesser number of certified beds in Peregrine's facilities. Peregrine contends that ODM's calculation ignores the plain language of R.C. 5165.23 and, therefore, is arbitrary and contrary to the intent of the General Assembly in enacting R.C. 5165.23.

{¶ 74} Resolving this disputed issue requires this Court to interpret the relevant statutory provisions, which is a question of law. This Court must determine whether ODM's denial of the critical access incentive payments to Peregrine, based on its interpretation of the term "occupancy rate" as used in R.C. 5165.23(A)(2), was unreasonable, arbitrary, and/or unconscionable. For the reasons that follow, I would find that it was.

{¶ 75} I restate paragraphs 26 through 28 of the majority decision for the purpose of creating clarity in understanding why I diverge from the majority in its application of the law to the claims of the parties.

{¶ 76} The parties agree that, in 2012,[5] the Ohio General Assembly enacted critical access incentive payments that could be awarded to nursing facilities located in highly distressed urban and rural communities to encourage the nursing facilities to remain in those communities, thereby keeping "vital and needed senior health services in place" there. (Petition at ¶ 11-12; ODM Mot. to Dismiss at 1.) The parties likewise agree the critical access incentive payments "were put in place to address the potential for a lack of access to healthcare by both rural and inner-city residents, a high proportion of whom are poor and chronically ill and—thus—more likely to be Medicaid recipients." (ODM Mot. to Dismiss at 1, citing Petition at ¶ 11-12.) The parties further agree that the critical access incentive payments make it economically feasible for the nursing facilities to remain in their communities, where they also help by providing significant local employment. *Id.*

{¶ 77} R.C. 5165.15 establishes the total per Medicaid day payment rate, including the critical access incentive payment, that ODM shall pay a nursing facility during a state fiscal year. Calculation of the Medicaid day payment rate for fiscal year 2017 required ODM to determine the sum of all the following in accordance with R.C. 5165.15(A):

> (1) The per medicaid day payment rate for ancillary and support costs determined for the nursing facility under section 5165.16 of the Revised Code;
>
> (2) The per medicaid day payment rate for capital costs determined for the nursing facility under section 5165.17 of the Revised Code;
>
> (3) The per medicaid day payment rate for direct care costs determined for the nursing facility under section 5165.19 of the Revised Code;
>
> (4) The per medicaid day payment rate for direct care costs determined for the nursing facility under section 5165.19 of the Revised Code;
>
> (5) If the nursing facility qualifies as a critical access nursing facility, the nursing facility's critical access incentive payment paid under section 5165.23 of the Revised Code.

---

[5] The statute, previously codified as R.C. 5111.246 but now codified as R.C. 5165.23, became effective on September 10, 2012.

{¶ 78} In order for a nursing facility to qualify for the critical access incentive payment provided for in R.C. 5165.15(A)(5), ODM must determine that the nursing facility satisfies the requirements of R.C. 5165.23(A), which provided for state fiscal year 2017 as follows:

> (A) Each state fiscal year, the department of medicaid shall determine the critical access incentive payment for each nursing facility that qualifies as a critical access nursing facility. To qualify as a critical access nursing facility for a state fiscal year, a nursing facility must meet all of the following requirements:
>
> (1) The nursing facility must be located in an area that, on December 31, 2011, was designated an empowerment zone under the "Internal Revenue Code of 1986," section 1391, 26 U.S.C. 1391.
>
> *(2) The nursing facility must have an occupancy rate of at least eighty-five per cent as of the last day of the calendar year immediately preceding the state fiscal year.*
>
> (3) The nursing facility must have a medicaid utilization rate of at least sixty-five per cent as of the last day of the calendar year immediately preceding the state fiscal year.
>
> (4) The nursing facility must have been awarded at least five points for meeting accountability measures under section 5165.25 of the Revised Code for the fiscal year and at least one of the five points must have been awarded for meeting the accountability measures identified in divisions (C)(9), (10), (11), (12), and (14) of section 5165.25 of the Revised Code.

(Emphasis added.) H.B. No. 483 as enacted by the 130th General Assembly, effective Sept. 15, 2014.

{¶ 79} ODM is to determine the critical access incentive payment for each nursing facility that qualifies for the payment in accordance with R.C. 5165.23. ODM issues on an annual basis its fiscal year rate setting reports to each nursing facility in the State. ODM must pay each qualified nursing facility the critical access incentive payment. R.C. 5165.15. A nursing facility that disagrees with the rate calculated by ODM may request reconsideration "of a prospective [nursing facility] rate on the basis of a possible error in calculation of the rate." Ohio Adm.Code 5160-3-24(A). Once a nursing facility requests reconsideration, ODM must respond in writing to the facility. Ohio Adm.Code 5160-3-

24(A)(3). ODM's decision at the conclusion of the rate reconsideration process is not subject to any administrative proceedings under R.C. Chapter 119 or any other provision of the Revised Code. Ohio Adm.Code 5160-3-24(B).

{¶ 80} The trial court's decision discusses the relevant statutes and rules but appears to wholly concede authority in this matter to ODM. The trial court states in its decision:

> The complexity of the Medicaid reimbursement system found in R.C. Chapter 5165 is difficult to overstate. The record reflects that nearly a thousand nursing home facilities operate across Ohio. They operate in empowerment zones, and in other vastly different settings urban, suburban, and rural. [ODM] must endeavor to stretch available funding while seeking to encourage quality care in all those varied settings. Writing and administering rules and formulas to capture the necessary date, track patient utilization, encourage new efforts like "critical access," and pay for it all in a timely fashion (while not falling victim to fraud) cannot easily be accomplished. For that reason, [ODM] is afforded substantial deference in how it fulfills its duties so long as it appears to be acting reasonably and in good faith.
>
> The evidence shows [ODM] was acting in a reasonable and good faith manner in implementing the modest legislative guidance on computing an "occupancy rate" pursuant to R.C. 5165.23(A)(2). Administrative agencies have the authority to make rules to fill gaps left, implicitly or explicitly, by legislature. *Silver Lining [Group EIC Morrow Co. v. Ohio Dept. of Edn. Autism Scholarship Program*, 10th Dist. No. 16AP-398, 2017-Ohio-7834], ¶ 50 and cases cited. "[W]hen a statute does not prescribe a particular formula or methodology, the appropriate administrative agency has broad discretion in deciding how to implement its duties. [citation omitted]." *In re Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, ¶ 36. [ODM] must be allowed to do so here.
>
> Principles of waiver or estoppel do not apply against the state or its agencies. *Silver Lining, supra* ¶ 54. Thus, the fact the [ODM] changed its interpretation of another formula – which the court accepts was done in good faith based upon the view that their original formula was mistaken – does nothing to demonstrate that the consistent interpretation applied to R.C. 5165.23 is unlawful.
>
> "It is a fundamental tenet of administrative law that an agency's interpretation of a statute that it has a duty to enforce will not be overturned unless the interpretation is unreasonable. *State*

> *ex rel. Clark v. Great Lakes Constr. Co.,* 99 Ohio St.3d 320, 2003-Ohio-3802, ¶ 10 and cases cited. To prove an abuse of discretion, the agency interpretation must be "unreasonable, arbitrary, or unconscionable." That plainly is not true here. [Peregrine] have not demonstrated they are entitled to a Writ.

(Decision at 7-8.)

{¶ 81} Although it is appropriate in some instances for a trial court to afford deference to an agency's interpretation of the statutes and rules applicable to its function, such deference is not unfettered—an agency's interpretation and application of its rules cannot be arbitrary, capricious, or otherwise contrary to law; nor can the interpretation and application constitute an abuse of discretion. *Ohio Academy of Nursing Homes, Inc. v. Barry*, 56 Ohio St.3d 120, 129 (1990). *See also Guethlein v. Ohio State Liquor Control Comm.*, 10th Dist. No. 05AP-888, 2006-Ohio-1525, ¶ 24; *HCMC, Inc. v. Ohio Dept. of Job & Family Servs.*, 179 Ohio App.3d 707, 2008-Ohio-6223, ¶ 25 (10th Dist.); *Athens Cty. Bd. of Commrs. v. Schregardus*, 83 Ohio App.3d 868 (1oth Dist.1992).   "A proposed interpretation that is inconsistent with or frustrates the legislative intent is not a reasonable one and does not create an ambiguity." *State v. Erskine*, 4th Dist. No. 14CA17, 2015-Ohio-710, ¶ 26.

{¶ 82} Based on a de novo review of the record, I would find ODM's latest interpretation of R.C. 5165.23(A)(2) to be arbitrary in that it changed with little to no explanation with no underlying change of language in the law.  The trial court's deference to the agency was not in keeping with the role of the judiciary to review the agency's decision according to a legal standard of review and by applying the law of statutory construction in reviewing this appeal—ascertaining and giving effect to the legislature's intent in enacting the statute, including its plain meaning. *State v. Bundy*, 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 46, quoting *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, ¶ 9.  ODM asserts that R.C. 5165.23(A)(2) is ambiguous because it does not define "occupancy rate," while that term is defined in other statutes in R.C. Chapter 5165.  ODM then engages in an in pari materia analysis with some of those other statutes, some of which were enacted years before R.C. 5165.23.

{¶ 83} I disagree that R.C. 5165.23(A)(2) is ambiguous. It is well-settled law in Ohio that a term is not ambiguous merely because it is not defined. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995).  Nor is "occupancy rate"

ambiguous as used here. The parties agree that occupancy occurs when a patient occupies a bed. The term "rate" is a "proportional or relative value; the proportion by which quantity or value is adjusted." *Black's Law Dictionary*, 1452 (10th Ed.2014). Consequently, occupancy rate is the percentage to which a nursing facility's beds are occupied during a certain period of time. The occupancy rate is determined by the number of actual beds located in the nursing facility available for Medicaid patients (that is, certified beds) and the number of patients occupying those beds (that is, inpatient days). ODM's current methodology operates to determine an occupancy rate using the number of licenses the nursing facility holds, regardless of the actual number of certified beds in the nursing facility, resulting in distorted results that ultimately frustrate the purpose for which the legislature enacted the critical access incentive payment.

{¶ 84} I compare the facts of the case before us with those this Court considered in *Eaglewood Care Ctr. v. State Certificate of Need Review Bd.*, 10th Dist. No. 91AP-357, 1992 Ohio App. LEXIS 1265, 1992 WL 55435 (Mar. 17, 1992). In *Eaglewood*, a nursing home sought review of the State Certificate of Need Review Board's ("CONRB") determination denying the nursing home's application for a certificate of need to construct an addition to an existing nursing home facility. The CONRB based its denial on a combination formula, which included "rest home beds, beds not in service, and beds not capable or permitted by licensure or certification status to serve the residents." *Id.* at *11. The *Eaglewood* Court rejected CONRB's approach, stating:

> Although not expressly stated by the hearing examiner, it appears that the findings were predicated upon an assumption that there are excess beds unless every bed in the county is occupied. Under such an assumption, there will always be an excess of beds in every county, since as a practical matter, it is completely unrealistic to have 100 percent occupancy at any time in all the nursing homes. This is why the only evidence as to full occupancy indicates that full occupancy commences at 95 percent. To this extent, the hearing examiner's findings adopted by CONRB are not supported by reliable, probative and substantial evidence and are contrary to law.
>
> The findings are predicated upon erroneous assumptions. First, restricted beds, such as those at the Masonic Home, should not be included. Inclusion of such beds in this case greatly distorts the occupancy rate in Clark County, both because of the substantial in-migration, and because of the

great number of unoccupied beds. Secondly, there was an assumption by the hearing examiner that all authorized beds necessarily are included. The law does not contemplate that some facilities can place numerous beds in a "bed bank" to be used at some undetermined future time if needed. Rather, even though "authorized" by its CON, beds which are not in existence and will not be in existence within the reasonable, foreseeable future, should not be counted in determining whether to grant a CON application.

The purpose of the CON determination is to serve the public in order to provide necessary facilities for the persons who need the service of the facility seeking the CON, not to benefit operators of other facilities who have no desire or intention of providing such service within the foreseeable future. The fact that the facility in question has a 99.11 percent occupancy rate as found by the hearing examiner, indicates that there is some need with respect to that facility. Whether 30 additional beds are needed is not a question that we can properly determine, such issue being for the CONRB. However, such determination must be predicated upon evidence directly pertinent to the need, and cannot be predicated solely upon the application of the so-called bed-need formula, as we indicated above.

*Id.* at *18 - 20. The *Eaglewood* court recognized that the policy in place "is to meet the needs of patients, not mathematical formulas." *Id.* at *24. This Court subsequently recognized that, just because beds are authorized (that is, licensed beds), it does not mean that they should be counted in determining whether to grant a certificate of need ("CON") application. *Summit Villa Care Ctr., Inc., v. Ohio Dept. of Health*, 81 Ohio App.3d 761, 767 (10th Dist.1992).

{¶ 85} I find the case before us similar to those CON cases, albeit the formulas may be different. The public policies for each exist to best serve Ohio's aging population, providing Ohioans equal access to quality care. Here, ODM's calculation is based on the presumption that occupancy for purposes of R.C. 5165.23(A)(2) includes all beds that potentially "*could have been made available* for occupancy." (Emphasis sic.) (ODM Combined Brief at 3.) The statute, however, does not indicate that the occupancy rate is based on a number of potential beds (licensed beds). At trial, ODM acknowledged that "if there are banked beds; i.e., beds that are out of service, they are automatically removed from capacity because they're not available for use by residents." (Nov. 22, 2017 Tr. at 73.)

{¶ 86} Courts have " 'no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend or improve the provisions of the statute to meet a situation not provided for.' " *Storer Communications, Inc. v. Limbach*, 37 Ohio St.3d 193, 194 (1988), quoting *State ex rel. Foster v. Evatt*, 144 Ohio St. 65 (1944), paragraph eight of the syllabus. By adopting ODM's interpretation of R.C. 5165.23(A)(2), the trial court erred in expanding and enlarging the definition of occupancy rate, contrary to the legislature's intent. *See also State ex rel. Gen. Elec. Supply Co. v. Jordano Elec. Co., Inc.*, 53 Ohio St.3d 66, 71 (1990), where the Supreme Court declined "to read into the statute an intent that the General Assembly could easily have made explicit had it chosen to do so."

{¶ 87} Similarly, if the legislature had intended R.C. 5165.23(A)(2) to encompass potential occupancy rather actual occupancy, it could have and would have said so. *Id.* The legislature enacted R.C. 5165.16 and 5165.17 more than a decade before enacting R.C. 5165.23. If the legislature had intended the term "occupancy rate" as used in R.C. 5165.23(A)(2) to have the same meaning as the earlier enacted statutes, it could have done so by including the same language or by referencing the other statutes in the newer statute. I am also persuaded that adopting ODM's interpretation of R.C. 5165.23(A)(2) would lead to unreasonable results and have consequences that are contrary to the legislature's stated purposes for the critical access incentive payment: to ensure that inner-city and rural communities have access to quality health care by providing incentives that will allow nursing facilities to continue operating in those communities. Just as in *Eaglewood*, the needs of the inner-city and rural populations must be considered; the purpose of the critical care incentive payment determination is to serve the public, and such determination cannot be predicated solely on the application of ODM's arbitrary and unreasonable interpretation of R.C. 5165.23(A)(2).

{¶ 88} Based on the foregoing reasons, I find that ODM's interpretation of occupancy rate under R.C. 5165.23(A)(2) that resulted in denying critical access incentive payments to Peregrine for state fiscal year 2017 was unreasonable and contrary to law. I would find, therefore, that the trial court erred in deferring to ODM's interpretation and denying Peregrine the writ of mandamus and would sustain Peregrine's three assignments of error.

## III.  LAW AND DISCUSSION - ODM'S CONDITIONAL CROSS-APPEAL

{¶ 89}  Since the majority decided Peregrine's appeal differently, it mooted ODM's cross-appeal.  On substantive grounds, I would deny it.  We review de novo a trial court's disposition of a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim on which relief can be granted.  *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, ¶ 5; *Adams v. Margarum*, 10th Dist. No. 16AP-515, 2017-Ohio-2741; *Rooney v. Ohio State Hwy. Patrol*, 10th Dist. No. 16AP-204, 2017-Ohio-1123; *Stewart v. Fifth Third Bank of Columbus, Inc.,* 10th Dist. No. 00AP-258, 2001 Ohio App. LEXIS 197, 2001 WL 58727 (Jan. 25, 2001).  "A motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint."  *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548 (1992); *Powell v. Vorys, Sater, Seymour and Pease*, 131 Ohio App.3d 681, 684 (10th Dist.1998).  In considering a Civ.R. 12(B)(6) motion to dismiss, a trial court may not rely on allegations or evidence outside the complaint.  *State ex rel. Fuqua v. Alexander*, 79 Ohio St.3d 206, 207 (1997).  Rather, the trial court must limit its consideration to the four corners of the complaint and may dismiss the case only if it appears beyond a doubt that the plaintiff can prove no set of facts entitling the plaintiff to recover.  *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242 (1975), syllabus; *Ritchie v. Ohio Adult Parole Auth.*, 10th Dist. No. 05AP-1019, 2006-Ohio-1210, ¶ 16, citing *Singleton v. Adjutant Gen. of Ohio,* 10th Dist. No. 02AP-971, 2003-Ohio-1838, ¶ 18.  In such cases, a trial court must presume that all factual allegations in the complaint are true and draw all reasonable inferences in favor of the nonmoving party.  *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1998).  This Court need not, however, accept as true any unsupported or conclusory legal propositions advanced in the complaint.  *Margarum* at ¶ 12, citing *Rooney* at ¶ 14.

{¶ 90}  ODM argues that the trial court improperly denied its Civ.R. 12(B)(6) motion to dismiss Peregrine's petition for a writ of mandamus for failure to state a claim on which relief could be granted.  ODM posits that Peregrine is barred from stating a valid claim for writs of mandamus compelling ODM to pay Peregrine critical access incentive payments because Peregrine did not meet the statutory criteria for such payments, based on ODM's interpretation of the term "occupancy rate" as it is used in R.C. 5165.23.  (ODM's Combined Brief in passim.)

{¶ 91} The trial court stated in its ruling denying ODM's motion to dismiss that attached to the verified original petition for a writ of mandamus were six exhibits, including "the extensive affidavit of Jeffrey Heaphy," whom the trial court ruled is "an expert in the nursing home industry." (Nov. 1, 2017 Journal Entry at 2-3.) The trial court found that the original verification of the petition by the nursing home facilities' president and the Heaphy affidavit appeared to add support to Peregrine's allegations. The trial court determined the petition stated the basis on which Peregrine alleged a "clear right to the payments for both of the denied claims and a clear legal duty upon ODM to make those payments, should this court find Peregrine's arguments valid." *Id.* at 3. The trial court concluded, therefore, that "[l]ooking solely at the verified petition and Heaphy affidavit, it would be inappropriate to dismiss [Peregrine's] claims at this preliminary stage." *Id.*

{¶ 92} Having independently reviewed the record, I would find the trial court's interpretation of the law and its application to ODM's Civ.R. 12(B)(6) motion to be sound. Accordingly, I would find that the common pleas court did not err in denying ODM's Civ.R. 12(B)(6) motion to dismiss, and ODM's assignment of error on cross-appeal should be overruled.

## IV.  CONCLUSION

{¶ 93} Based on the foregoing, I would sustain Peregrine's assignments of error on appeal, reversing the judgment of the Franklin County Court of Common Pleas denying the requested writ of mandamus and thereby grant the writ of mandamus ordering ODM to distribute critical access incentive payments to Peregrine for state fiscal year 2017, consistent with this dissent.

{¶ 94} Additionally, I would overrule ODM's assignment of error on cross-appeal, thereby affirming the decision of the Franklin County Court of Common Pleas denying ODM's March 7, 2017 motion to dismiss Peregrine's complaint for failure to state a claim on which relief may be granted pursuant to Civ.R. 12(B)(6) and deny ODM's cross-appeal.

_____